

# THE ATTORNEY GENERAL
## OF TEXAS

October 5, 1987

JIM MATTOX
ATTORNEY GENERAL

Honorable Kent Caperton                    Opinion No.   JM-805
Chairman
Jurisprudence Committee                    Re:  Whether a home rule city may
Texas State Senate                         issue general obligation bonds to
P. O. Box 12068                            finance  public  housing  for  low
Austin, Texas   78711                      income    and    moderate    income
                                           families

Dear Senator Caperton:

You advise that a home rule city is considering issuing general obligation bonds to provide a fund for financing various affordable housing programs. Your first question is as follows:

> Does the provision of housing for low and moderate income families constitute a 'public purpose' for which a home rule city may issue general obligation bonds, and expend the proceeds thereof, without express authorization under state law and/or city charter?

Your question is essentially whether home rule cities hold the authority to issue general obligation bonds for this purpose.

Home rule cities derive their powers directly from article XI, section 5, of the Texas Constitution. <u>Lower Colorado River Authority v. City of San Marcos</u>, 523 S.W.2d 641, 643 (Tex. 1975). A home rule city may exercise, within its jurisdiction, any power the legislature may exercise, subject only to limits established in the Texas Constitution and statutes and in the city's charter. Because a home rule city's powers derive directly from the constitution, limits on those powers must appear with "unmistakable clarity." 523 S.W.2d at 645; <u>City of Sweetwater v. Geron</u>, 380 S.W.2d 550, 552 (Tex. 1964).

---

1. This opinion does not address the limits or absence of limits in any home rule city's charter. It is the primary responsibility of city attorneys to interpret the limits of their cities' charters.

You ask about general obligation bonds to finance public housing for low and moderate income families. General obligation bonds, unlike revenue bonds, are not limited to the earnings of the project financed. General obligation bonds are to be repaid from the general revenue fund of a city. For this reason, limits on cities' taxing powers must be considered.

Although article XI, section 5, contains no express limit on the amount of bond debt that a home rule city may incur, it contains limits on a home rule city's taxing power. There are additional limits enforced through the requirement that the attorney general determine whether the total tax and other resources of a city will support the additional interest and retirement burden of the bonds. See V.T.C.S. art. 1175, §10. The ultimate practical limit is enforced by the bond market. This opinion does not constitute implicit approval of an additional bond burden for any particular home rule city.

Article VIII, section 3, of the Texas Constitution provides: "Taxes shall be levied and collected by general laws and for public purposes only." See also Tex. Const. art. III, §52 (prohibiting grants of public funds for private purposes). Although article XI, section 5, creates an exception with regard to the general law requirement, the public purpose requirement remains. In Housing Authority of City of Dallas v. Higginbotham, 143 S.W.2d 79, 89 (Tex. 1940), the court upheld a legislative determination that providing housing for low-income families serves a public purpose. See V.T.C.S. art. 1269k, repealed and replaced, effective September 1, 1987, with the Local Government Code. See Acts 1987, 70th Leg., ch. 149, §§1, 49, at 1397, 2544. The legislature has also indicated, through the enactment of several statutes, that providing moderate-income families with affordable, sanitary housing serves a public purpose. See V.T.C.S. arts. 12691-6, §4; 12691-7, §3. (Article 12691-7 was repealed and replaced, effective September 1, 1987, with the Local Government Code. See Acts 1987, 70th Leg., ch. 149, §§1, 49, at 1397, 2544.) Although the question of whether a public purpose is actually served by the application of a particular measure is a question for the courts, the legislative determination of what constitutes a public use will not be overturned absent a finding that the determination is arbitrary or that it deprives a party of property without due process. Davis v. City of Lubbock, 326 S.W.2d 699, 714 (Tex. 1959). Because a home rule city has plenary powers, a city's determination that providing affordable housing for low and moderate income families serves a public purpose is entitled to the same "legislative presumption" of validity. Consequently, the issuance of general obligation bonds to finance affordable housing for low and moderate income families does not per se violate the public purpose requirements of article VIII, section 3, and article III, section 52, of the Texas Constitution.

Legislative limits must also be considered. As indicated, a home rule city may not take actions that conflict with state legislation. City of Brookside Village v. Comeau, 633 S.W.2d 790, 796 (Tex.), cert. denied, 459 U.S. 1087 (1982). City action is preempted if legislation expressly prohibits the action, if the legislature intended state law to occupy the field covered by the action, or if the city's action is in direct conflict with state law even when the state law does not occupy the field. See Attorney General Opinions JM-619 (1987); JM-226 (1984); H-1071 (1977).

Section 10 of article 1175, V.T.C.S., provides that home rule cities hold the following power:

> The power to control and manage the finances of any such city; to prescribe its fiscal year and fiscal arrangements; the power to issue bonds upon the credit of the city for the purpose of making permanent public improvements or for other public purposes in the amount and to the extent provided by such charter, and consistent with the Constitution of this State; provided, that said bonds shall have first been authorized by a majority vote by the duly qualified property tax-paying voters voting at an election held for that purpose. Thereafter all such bonds shall be submitted to the Attorney General for his approval, and the Comptroller for registration, as provided by law. . . .

Section 10 does not prohibit the issuance of the type of bonds at issue here; it simply places certain conditions on the issuance of general obligation bonds. The "public purpose" requirement in section 10 echoes the constitutional requirement discussed above. As indicated previously, the requirement of approval by the attorney general places limits on the maximum amount of a city's bonded indebtedness. Additionally, section 10 requires voter approval of the bonds.[2] Thus, section 10 of article 1175 does not create insurmountable limits on the issuance of general obligation bonds for affordable housing for low and moderate income families.

---

2.  This opinion does not address validity of the reference in article 1175, section 10, to only "property tax-paying voters." See generally City of Phoenix v. Kolodziejski, 399 U.S. 204 (1970); cf. Salyer Land Co. v. Tulare Lake Basin Water Storage District, 410 U.S. 719 (1973).

Nor do any other statutes expressly limit the authority of home rule cities with regard to providing affordable housing for low and moderate income families.[3] As indicated, however, city action is also preempted if the city's action conflicts with state legislation or if the legislature intended state law to occupy the field at issue.

The legislature enacted a series of statutes authorizing the provision of affordable housing for low and/or moderate income residents. See V.T.C.S. arts. 1269k, 12691-3, 12691-4, 12691-7, repealed and replaced, effective September 1, 1987, with the Local Government Code. In light of these enactments, parallel actions by a city to achieve the same purpose cannot be said to be in "conflict" with these statutes. Local actions, ancillary to and in harmony with the general scope and purpose of state enactments, are acceptable. See City of Brookside Village v. Comeau, 633 S.W.2d at 796. The state's entry into a field of regulation does not in and of itself evidence the legislative intent to preempt that field from municipal action. See id. Implied limits on a home rule city's powers must appear with "unmistakable clarity." Lower Colorado River Authority v. City of San Marcos, 523 S.W.2d at 645. There is no indication in the general laws regarding urban renewal and affordable housing that the general laws are intended to occupy the field of affordable housing.

The fact that Higginbotham, supra, and Davis, supra, affirmed the authority of local governing entities to address conditions of substandard housing through legislative enactments does not mean that home rule cities are limited to those general laws in carrying out these authorized public purposes. For example, in City of College Station v. Turtle Rock Corporation, 680 S.W.2d 802, 807-08 (Tex. 1984), the Texas Supreme Court upheld a home rule city's parkland dedication ordinance despite the fact that several statutes authorized municipalities to acquire parkland by other methods. The court indicated that enabling statutes may serve as specific grants of power to entities other than home rule cities. Id. The simple fact of the existence of these enabling statutes does not "unmistakably" limit the powers of a home rule city with regard to the actions authorized by the statutes. Id.

Moreover, statutes that authorize governmental bodies to engage in certain public activities are qualitatively different than statutes that authorize governmental bodies to regulate private activities.

---

3. This opinion does not address state and federal antitrust limits that could be relevant, depending upon how the affordable housing program is administered. See generally Attorney General Opinion JM-560 (1986).

Courts ordinarily find "clearly implied" limits when municipalities attempt to regulate in a field regulated by state statutes. See Attorney General Opinion JM-619 (1987) (and cases discussed therein). Conflict is more likely when both the state and a political subdivision attempt to regulate one activity than when two types of political subdivisions offer similar public services.

You also ask several questions about various methods of providing affordable housing to low and moderate income families:

> 2. May a home rule city purchase or construct multi-family housing and directly or indirectly sell or lease units in such housing to low income residents at below market prices or rents?

> 3. May a home rule city directly contract with private nonprofit entities to provide rental or sale housing for low and moderate income residents with funds provided by the city from the proceeds of the sale of its general obligation bonds?

> 4. May a home rule city enter into a cooperation agreement with a local public housing authority, providing for the purchase of land and the installation of infrastructure by the city, using the proceeds of general obligation bonds issued by it, with the housing to be constructed by the housing authority through the [issuance] of its own revenue bonds?

> 5. May a home rule city purchase individual lots or tracts of land, to be conveyed to public or private development entities, at cost, to provide housing for low and moderate income residents? May the city also purchase such real property to hold for future use as the sites for housing for low and moderate income families?

Because your second and fifth questions refer, respectively, to conveyances of real property "at below market prices" and "at cost," article 5421c-12, V.T.C.S. (repealed and replaced, effective September 1, 1987, with the Local Government Code, see Acts 1987, 70th Leg., ch. 149, §§1, 49, at 1397, 2546), must be addressed. Article 5421c-12 requires public notice and competitive bidding for the sale of public land by a political subdivision. Subsection (5) of section 2 of article 5421c-12 contains an exception for the competitive bidding procedures when a political subdivision's land is to be "developed by contract with an independent foundation." This subsection authorizes cities to convey public land at fair market value for the construction

of housing for low-income citizens by a private, not-for-profit corporation that qualifies as an independent foundation under state law.  Attorney General Opinion MW-46 (1979).  The foundation must agree to develop the land as required by the city.  Id.  Additionally, the statute expressly prohibits conveyances, even those made under the exemptions set forth in section 2, at less than fair market value. Art. 5421c-12, §4.  Of course, if the foundation paid fair market value, the statute does not prevent the foundation from then selling the land at below market prices.

Additionally, a home rule city could enter into a cooperation agreement with a local housing authority pursuant to article 12691, V.T.C.S., the Texas Housing Co-operation Law, repealed and replaced, effective September 1, 1987, with the Local Government Code, see Acts 1987, 70th Leg., ch. 149, §§1, 49, at 1397, 2544.  Article 12691 authorizes cities to convey real property to local housing authorities and authorizes local housing authorities to sell or lease property to persons of low income.  The act does not require compliance with the competitive bidding provisions or require that the conveyance be at a fair market price.

Your questions also raise issues under the constitutional provisions requiring a "public purpose" for the expenditure of public funds.  See Tex. Const. art. III, §52.  The fact that a home rule city's determination that providing affordable housing to low and moderate income families serves a public purpose is entitled to a presumption of validity does not end the inquiry.  Article III, section 52, of the Texas Constitution prohibits grants of public funds for private purposes.  This prohibition extends to not-for-profit organizations, see Attorney General Opinions JM-274 (1984); MW-329 (1981), and to other political subdivisions.  Harris County Flood Control District v. Mann, 140 S.W.2d 1098 (Tex. 1940); Attorney General Opinions JM-768 (1987); JM-220 (1984).  A merely incidental benefit to another entity is not prohibited.  Attorney General Opinion JM-274; see Barrington v. Cokinos, 338 S.W.2d 133 (Tex. 1960).  In light of article III, section 52, any contract with a private entity and any cooperative agreement with a local housing authority under article 12691 must contain provisions to assure that a valid public purpose will be accomplished and to assure that the city will receive a quid pro quo for its expenditure.  See Attorney General Opinion JM-768 (1987).

## S U M M A R Y

A home rule city's issuance of general obligation bonds to finance affordable housing for low and moderate income families does not per se violate the public purpose requirements of article VIII, section 3, and article III, section 52, of

the Texas Constitution. Although some statutes limit the manner of issuing general obligation bonds and the manner in which an affordable housing program may be carried out, no statutes prohibit the issuance of general obligation bonds by a home rule city to finance affordable housing for low and moderate income families.

Very truly yours,

JIM MATTOX
Attorney General of Texas

MARY KELLER
Executive Assistant Attorney General

JUDGE ZOLLIE STEAKLEY
Special Assistant Attorney General

RICK GILPIN
Chairman, Opinion Committee

Prepared by Jennifer Riggs
Assistant Attorney General